IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ERROL T. WILEY                :     CIVIL ACTION
                              :
          v.                  :
                              :
CITY OF PHILADELPHIA          :
POLICE DEPARTMENT, et al.     :     NO. 12-5984

MEMORANDUM

McLaughlin, J.                              May 19, 2014

　　　　This action arises out of Errol Wiley's arrest on
December 16, 2010, for aggravated assault by handgun and related
charges, and the execution of search warrants at Wiley's home
and on Wiley's car.  The search warrant for Wiley's home was
supported by an affidavit of probable cause based on statements
by Regina Clozier, the woman who the plaintiff allegedly
assaulted.

　　　　The plaintiff brought suit against the City of
Philadelphia and Detective Robert Daly, Jr.,[1] alleging that his
rights under the Fourth Amendment of the U.S. Constitution were
violated during the execution of the search warrants and the
arrest warrant.  The plaintiff alleges the following Fourth

---

[1] The Court interprets the claims brought against Detective
Daly as being in his individual capacity.  Because the City of
Philadelphia is already named as a defendant, any claims brought
against Detective Daly in his official capacity would be
redundant.  See, e.g., Gregory v. Chehi, 843 F.2d 111, 120 (3d
Cir. 1988); see also Verde v. City of Phila., 862 F. Supp. 1329,
1336-37 (E.D. Pa. 1994).

Amendment claims:  false arrest, excessive force, and municipal liability.

For the following reasons, the Court will now grant the defendants' motion for summary judgment in its entirety.

I.  Factual Background

A.  Incident with Regina Clozier[2]

It is undisputed that, on December 15, 2010, around 1:30 pm, Wiley interacted with a woman named Regina Clozier in front of Wiley's home in Philadelphia.  Wiley's and Clozier's accounts of this interaction differ greatly, however.

Wiley states, in an affidavit in opposition to the motion for summary judgment, that on the afternoon of December 15, 2010, he heard knocking and then banging on his front door. The plaintiff answered his door, and asked the woman standing there who she was and why she was banging on his door.  The woman stated that Wiley had not gone to child support court, and she then left Wiley's home.  Wiley shut his door and went back inside.  Wiley assumed that the woman was his youngest daughter's mother's relative.  Pl.'s Aff. Opp'n Mot. Summ. J. ¶¶

---

[2] Regina Clozier's name is sometimes spelled "Clozie" in the exhibits to the briefing on the motion for summary judgment. The Court uses the spelling "Clozier," as is reflected in the defendants' brief.

4-6 ("Wiley Affidavit"); Defs.' Mot. Summ. J., Ex. A at 9:14-
11:14 ("Wiley Deposition").

    B.   <u>Clozier's Report to Philadelphia Police</u>

       The Southwest Detectives Division in the 12th District
received a complaint on December 15, 2010, that an aggravated
assault had occurred around 1:35 pm that day.  Detective Daly
interviewed the complainant, Regina Clozier.

       Clozier stated that she was babysitting her four-
month-old niece on December 15, 2010.  She ran out of diapers
and went to the home of her niece's father, Errol Wiley.
Clozier alleged that she knocked on his door and Wiley answered,
asking angrily what she was doing there.  Clozier told Wiley
that her niece needed Pampers.  After she asked Wiley for money
to purchase diapers, Wiley told her to stop knocking on his door
and not to come back.  While Clozier was arguing with Wiley, he
reached into his waist area underneath his sweater and pulled
out a small, silver semi-automatic handgun with black grips and
pointed it at her.  Clozier told police that Wiley chased her on
the street with the gun until she was in sight of the 12th
District police station, at which point he ran back to his
house.  Defs.' Mot. Summ. J., Ex. B ("Arrest Report"); Defs.'
Mot. Summ. J., Ex. D ("Clozier Investigation Interview Record").

After reporting the incident with Wiley, Clozier returned to Wiley's residence with police officers.  Clozier told officers that Wiley's car had been moved from where it was originally parked to in front of his home.  Clozier told police that the car was warm to the touch.  Police knocked on the front door of Wiley's home, but there was no answer.  Arrest Report.

Clozier then returned to the 12th District police station with officers.  Clozier told police that she had met Wiley approximately three times in the last year.  Clozier was shown a photo array containing a four-year-old photo of Wiley.  She did not positively identify anyone in that array.  Clozier then was shown an array containing Wiley's two-year-old driver's license photo.  From that array, Clozier did identify Wiley as the man who pointed the gun at her and chased her to the police station based on his driver's license photo.  Arrest Report; Clozier Investigation Interview Record.


C.   Search Warrant

A search warrant was obtained for Wiley's home on December 15, 2010.  The warrant identified the following items to be searched for and seized:  "Firearms, ballistic evidence, proof of residency/occupancy documents in the name of Errol Wiley.  Any and all items of evidentiary value."  Defs.' Mot. Summ. J., Ex. F ("Search Warrant 154534").

4

The warrant was supported by an affidavit of probable
cause completed by Detective Daly.  The affidavit contained the
facts as stated in the Arrest Report and the Clozier
Investigation Interview Record, including Clozier's recounting
of the incident with Wiley, Clozier's return to the scene with
police, and her identification of Wiley in the photo array.
Based "on the possibility of removing/destroying the evidence
used in this crime," Detective Daly requested a night time
search warrant to recover the weapon.  Defs.' Mot. Summ. J., Ex.
G ("Continuation of Probable Cause for Warrant 154534").

       D.   <u>Execution of Search Warrant</u>

It is undisputed that on December 16, 2010, between
2:30 and 3:00 am, Detective Daly executed the search warrant for
Wiley's home with members of the SWAT team.  Wiley was arrested
inside of his home by members of the SWAT team.  No firearm was
recovered during the search of the plaintiff's home.  Arrest
Report; Wiley Affidavit ¶¶ 7, 14, Wiley Deposition at 18:8-
18:10.

Although the Arrest Report states that Wiley was
arrested "without incident," Wiley's complaint, deposition, and
affidavit state that he was injured during his arrest.

In his deposition, Wiley testified that he and his
fiancée, Robin Williams, had fallen asleep downstairs watching

TV on December 15.  They were awakened because the front door
"came crashing in."  Wiley Deposition at 11:19-11:22; see also
Compl. at 3.  The police "blasted their way through" the front
door to the enclosed porch, and Wiley opened the main door to
his home.  Wiley Deposition at 13:8-14:12.  The police made him
and his fiancée lie on the floor, and held them at gunpoint with
shotguns.  The police then handcuffed Wiley on the floor,
although his fiancée was not handcuffed.  Wiley Deposition at
11:23-12:7, 15:2-15:10, 17:5-17:10, 18:11-19:5; see also Wiley
Affidavit ¶ 8; Compl. at 3.

        Officers picked Wiley up off the floor while he was
handcuffed, allegedly spraining Wiley's shoulder.  Compl. at 3.
Wiley's arms were handcuffed behind his back as he lay on the
floor.  One officer grabbed Wiley's hands and started lifting
him up.  Wiley got to his knees and stood up as the officer was
picking him up.  There was no other physical contact between
Wiley and the officer.  Wiley Deposition at 20:7-22:3.

        Detective Daly entered the home after Wiley was
handcuffed and was standing up with one of the officers.   Id.
at 22:18-22:24.  Detective Daly questioned Wiley as to where his
guns were located; Wiley told police that he did not possess any
guns.  Wiley testified that police "ransacked" his house looking
for weapons, and that police "flipped the living room tables
over, took the tiles out of the ceiling, flipped the beds over."

<u>Id.</u> at 12:8-12:23, 17:16-17:18, 19:6-20:6; <u>see also</u> Wiley
Affidavit ¶¶ 9-11.

      Detective Daly then took Wiley from the house and
questioned him about his car.  Wiley identified that he had a
2003 silver Acura TL, and Detective Daly took Wiley's car keys.
Wiley Deposition at 23:7-23:15, 24:3-24:8; Wiley Affidavit ¶ 12.
Wiley was then placed in the police car.  Detective Daly told
Wiley that he was being arrested because "you chased a woman
down the street today with a gun."  Wiley Deposition at 22:5-
22:10; Wiley Affidavit ¶ 13.  Wiley stated that police were in
the house for approximately twenty minutes when he was taken
from the home.  Wiley Deposition at 17:21-17:23.


    E.   <u>Seizure of Plaintiff's Car</u>

      After Wiley's arrest, his car was recovered and taken
to M&W, a police vehicle holding facility, while police obtained
a search warrant.  <u>See</u> Defs.' Mot. Summ. J., Ex. E ("Search
Warrant 154540"); Defs.' Mot. Summ. J., Ex. H ("Property
Receipt").  The Auto Pound Inventory document attached to the
defendants' motion for summary judgment states that the car was
released to the owner on April 11, 2011.  The form lists Wiley
as the owner of the car.  Defs.' Mot. Summ. J.., Ex. I ("Auto

Pound Inventory").[3]   A document entitled "Evidence
Custodian Record" also shows the status as "Returned to Owner."   Pl's Mem.
Opp'n Mot. Summ. J., Ex. B-D ("Evidence Custodian Record").

Wiley testified that his car was not returned.   He
stated that he spoke with Detective Daly and asked for his car,
but he was told that he could not retrieve his car until the
investigation concluded.   Wiley states that he was never
notified of the status or location of his car.   Wiley states
that he received a letter from his insurance company in April
2011 that the car was sold at auction.   Wiley Deposition at
26:21-27:5; Wiley Affidavit ¶¶ 25-26.

F.   Injuries

Wiley was ultimately released on bail the following
day.   Wiley Deposition at 12:24-13:1; Wiley Affidavit ¶ 21.
Wiley asserts that he sustained injuries to his wrists and
shoulders, and that they hurt for days.   Wiley Deposition at
27:6-27:12.   Wiley alleges that he sustained a shoulder sprain
from being forcefully lifted off the floor while handcuffed.   He
also suffered abrasions on both forearms from his handcuffs, and
he was mentally traumatized and humiliated.   Compl. at 3.
Wiley's arms were injured as a result of his handcuffs being put

---

[3] Wiley contests that his signature does not appear on this
exhibit.   Wiley Affidavit ¶ 26.

on too tight when he was placed in the police vehicle.  Wiley did not seek medical attention and did not see any doctors.  Wiley Deposition at 25:17-26:2, 26:12-26:17.

Wiley also testified that, as a result of the police searching his time, his dining room set was scratched and that his filing cabinet was forced open.  Id. at 19:8-16.[4]  Finally, Wiley was unemployed from December 2010 to July 2011 because his vehicle was confiscated, and the criminal charges pending against him impeded his employment opportunities.  Wiley Affidavit ¶ 22.

---

[4] Wiley had no photos of his living room or any other rooms of his house to show that they were ransacked.  Wiley Deposition at 20:3-20:6.

II. <u>Analysis</u>[5]

      The complaint seeks relief under 42 U.S.C. § 1983, which provides a private right of action against any person who, acting under color of state or territorial law, abridges "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  <u>Nextel Partners Inc. v. Kingston Twp.</u>, 286 F.3d 687, 693-94 (3d Cir. 2002).

      The plaintiff's complaint alleges a claim under 42 U.S.C. § 1983 for violations of his Fourth Amendment rights.

---

[5] A party is entitled to summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, which may be satisfied by demonstrating the party who bears the burden of proof lacks evidence to support his case.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once a properly supported motion for summary judgment is made, the burden of production shifts to the nonmoving party, who must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  Where a moving party identifies an absence of necessary evidence in the record, the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.  <u>Berckeley Inv. Grp. v. Colkitt</u>, 455 F.3d 195, 201 (3d Cir. 2006).  A party opposing summary judgment must present affirmative evidence—whether direct or circumstantial—to defeat summary judgment, and may not rely simply on the assertion that a reasonable jury could discredit the opponent's account.  <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 514 (3d Cir. 2003).

In reviewing a motion for summary judgment, the Court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in the light most favorable to the party opposing the motion.  <u>Siegel Transfer, Inc. v. Carrier Express, Inc.</u>, 54 F.3d 1125, 1127 (3d Cir. 1995).

Wiley alleges that he was subjected to excessive force and false arrest by Detective Daly, and that the City of Philadelphia should be subject to municipal liability for those actions.

### A.   False Arrest

Wiley's first claim under § 1983 pertains to the reasons for his arrest; Wiley alleges in his complaint that the police searched his home "in search of weapons that didn't exist," and he was arrested "even though no weapons were found." Compl. at 3.  The Court interprets this claim as one for false arrest.

The defendants argue that, based on the facts known to the defendants at the time of the plaintiff's arrest, the defendants had probable cause to arrest.  Defs.' Mot. Summ. J. at 8.  In his opposition to the defendants' motion for summary judgment, Wiley argues that the defendants recovered no evidence of a crime to support an arrest and did not perform an independent investigation to determine if Clozier's complaint was reliable.  Pl's Mem. Opp'n Mot. Summ. J. at 3-5.

The Fourth Amendment "prohibits a police officer from arresting a citizen except upon probable cause." Orsatti v. N.J. State Police, 71 F.3d 480, 482 (3d Cir. 1995).  Where a police officer causes an arrest to be made pursuant to a warrant obtained on the basis of statements he knew to be false or on

11

the basis of statements he makes in reckless disregard of the truth, a plaintiff may recover damages under § 1983 for "unreasonable seizure" of his person in violation of the Fourth Amendment.  Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993).

An arrest warrant "does not, in itself, shelter an officer from liability for false arrest."  Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000).  Instead, a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence, that:  (1) the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) such statements or omissions are material, or necessary, to the finding of probable cause.  Id. at 786-87.  Thus, a court faced with a claim that an arrest warrant contains false assertions and omissions must first determine whether the officer made those assertions or omissions deliberately or with reckless disregard for the truth.

Whether something is done deliberately is a question of fact.  Assertions are made with reckless disregard when, viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.

Id. at 788.  Assertions can be made with reckless disregard for
the truth even if they involve minor details.  Recklessness is
measured not by the relevance of the information, but the
demonstration of willingness to affirmatively distort truth.
Id.  "[O]missions are made with reckless disregard for the truth
when an officer recklessly omits facts that any reasonable
person would know that a judge would want to know" in making a
probable cause determination.  Id. at 783.

     After establishing that "there [is] sufficient
evidence of omissions and assertions made knowingly, or with
reckless disregard for the truth," a court "assess[es] whether
the statements and omissions made with reckless disregard of the
truth were 'material, or necessary, to the finding of probable
cause.'"  Id. at 789 (quoting Sherwood v. Mulvihill, 113 F.3d
396, 399 (3d Cir. 1997)).  "To determine the materiality of the
misstatements and omissions," a court must "excise the offending
inaccuracies and insert the facts recklessly omitted, and then
determine whether . . . the 'corrected' . . . affidavit would
establish probable cause."  Id.

     The Court finds no evidence on the record of any
omission or misrepresentation by Detective Daly.  Wiley also
cites no evidence of any omission or misrepresentation in his
opposition to the motion for summary judgment.  Rather, the
complaint and opposition make the bare assertion that Clozier

has a history of fabricated complaints.  There is no evidence in the record to suggest that Clozier made any prior fabricated complaints or that Detective Daly was aware of any allegedly fabricated complaints.  See LeBlanc v. Stedman, No. 10-5215, 2011 WL 6181129, at *5 (E.D. Pa. Dec. 13, 2011) (granting motion for summary judgment where "LeBlanc offers no evidence that Pappas made this alleged omission with the requisite mens rea. LeBlanc relies on his unsubstantiated assertions.  There is nothing in the record showing or tending to show that Pappas knew or should have known that LeBlanc had not submitted an insurance claim."), aff'd, 483 F. App'x 666 (3d Cir. 2012); White v. Brown, 408 F. App'x 595, 598-99 (3d Cir. 2010); Gebhart v. Vaughn, 378 F. App'x 131, 132 n.1 (3d Cir. 2010).

        Because the Court finds that there is no evidence to support the first prong of the false arrest claim, the Court need not reach the issue of whether there was probable cause to arrest Wiley.  However, to the extent that Wiley argues that the police should have investigated Clozier's complaint more thoroughly, Detective Daly was not "required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed."  Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 790 n.8 (3d Cir. 2000); see also Coley v. Cnty. of Essex, 462 F. App'x 157, 160-61 (3d Cir. 2011).

Accordingly, summary judgment is granted on the § 1983 claim to the extent it is based on false arrest.


    B.    Excessive Force

        Wiley's second claim under § 1983 pertains to the harm he allegedly incurred during his arrest; the Court interprets this claim as one for excessive force.  The Fourth Amendment prohibits the use of unreasonably excessive force when making an arrest.  Wilson v. Dewees, No. 10-3915, 2013 WL 5567574, at *7 (E.D. Pa. Oct. 9, 2013) (citing Brower v. Cnty. of Inyo, 489 U.S. 593, 599 (1989)).  To state a claim for excessive force under § 1983, the plaintiff must show that a seizure occurred and that it was unreasonable.  Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).  Whether a police officer uses excessive force during the course of an arrest is determined using a reasonableness standard, giving careful attention to the facts and circumstances of each particular case, and recognizing that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat of physical coercion to effect it.  Graham v. Connor, 490 U.S. 386, 396 (1989).

        Factors for the Court to consider when making this determination include the severity of the crime, whether the suspect posed an immediate threat to public safety, and whether

15

the suspect was actively resisting or evading arrest.  <u>See</u>
<u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 240 (3d Cir.
2004).  Other factors include the possibility that the suspect
is violent, the duration of the action, and the possibility that
the suspect may be armed.  <u>Sharrar v. Felsing</u>, 128 F.3d 810, 822
(3d Cir. 1997), <u>abrogated on other grounds by</u> <u>Curley v. Klem</u>,
499 F.3d 199 (3d Cir. 2007).

In his opposition to the motion for summary judgment,
Wiley asserts that Detective Daly's subordinates acted under his
orders in forcing Wiley to lay on his floor, handcuffing him,
yanking him to his feet, and making him stand a gunpoint.  When
a plaintiff brings a § 1983 claim against a defendant in his
individual capacity, however, the plaintiff must establish that
the defendant had "personal involvement in the alleged wrongs;
liability cannot be predicated solely on the operation of
respondeat superior."  <u>Rode v. Dellarciprete</u>, 845 F.2d 1195,
1207 (3d Cir. 1988) (emphasis omitted); <u>see also</u> <u>Monell v. Dep't</u>
<u>of Soc. Servs.</u>, 436 U.S. 658, 691 (1978).  A defendant in a
civil rights action cannot be held responsible for a
constitutional violation which he neither participated in nor
approved.  <u>Baraka v. McGreevey</u>, 481 F.3d 187, 210 (3d Cir.
2007).  Personal involvement can be demonstrated by evidence
that the officer personally directed or had actual knowledge and
acquiescence of the alleged wrongs.  <u>Rode</u>, 845 F.2d at 1207.

There is no record evidence that Detective Daly individually used force against Wiley during his arrest.  To the contrary, Wiley testified at his deposition that, Detective Daly, the only officer named as a defendant in this case, was not the officer who handcuffed Wiley.  Wiley Deposition at 22:22-23:4.  Aside from having handcuffs placed on him and being pulled to a standing position by another officer, there was no other physical contact between Wiley and any of the officers. Id. at 21:11-22:3.

To the extent that Wiley is arguing that Detective Daly should be subject to supervisory liability for excessive force because he was present and directed the other police officers and SWAT team members during his arrest, that claim also fails.  There is no evidence that Detective Daly was the supervisor of the SWAT unit or the other officers; there is only evidence that the SWAT team assisted in executing the search warrant and that there were at least six officers present in Wiley's home.  Arrest Report; Wiley Deposition at 15:11-16:4. Even if Detective Daly was acting in a supervisory role, liability is based on the supervisor's own acts or omissions, not those of the individual officers in the unit.  See Agresta v. City of Phila., 801 F. Supp. 1464, 1468 (E.D. Pa. 1992), aff'd sub nom. Agresta v. Sambor, 993 F.2d 223 (3d Cir. 1993). There is no evidence here that Detective Daly directed any use

of force against Wiley.  Wiley was handcuffed and picked up off
the floor before Detective Daly entered his home, for example.
Wiley Deposition at 22:18-22:24.  Therefore, summary judgment is
granted to on the § 1983 claim to the extent it is based on
excessive force.

     C.   Municipal Liability

     Wiley asserts a claim against the City of Philadelphia
for municipal liability.  A municipality cannot be held liable
under § 1983 for the actions of its employees on a respondeat
superior theory.  Monell, 436 U.S. at 691.  When a municipal
entity is sued under § 1983, "the municipality can only be
liable when the alleged constitutional transgression implements
or executes a policy, regulation or decision officially adopted
by the governing body or informally adopted by custom." Beck v.
City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996).

     There also must be a "'direct causal link between a
municipal policy or custom and the alleged constitutional
deprivation' to ground municipal liability." Jiminez v. All Am.
Rathskeller, Inc., 503 F.3d 247, 249-50 (3d Cir. 2007) (quoting
City of Canton v. Harris, 489 U.S. 378, 385 (1989)).  Liability
is imposed "when the policy or custom itself violates the
Constitution or when the policy or custom, while not
unconstitutional itself, is the 'moving force' behind the

constitutional tort of one of its employees." <u>Colburn v. Upper Darby Twp.</u>, 946 F.2d 1017, 1027 (3d Cir. 1991) (quoting <u>Polk Cnty. v. Dodson</u>, 454 U.S. 312, 326 (1981)).

A plaintiff can demonstrate the existence of a policy by showing that a decisionmaker possessing final authority to establish an entity's policy with respect to the action issues an official proclamation, policy, or edict.  <u>Mulholland v. Gov't Cnty. of Berks</u>, 706 F.3d 227, 237 (3d Cir. 2013).  A course of conduct is considered to be a custom when, although not authorized by law, officials' practices are so permanent and well-settled as to virtually constitute law.  <u>Id.</u>

The Third Circuit has explained that there are three situations in which acts of an employee may be deemed to be the result of a policy or custom of the municipal entity for which he works: (1) the appropriate officer or entity promulgates an applicable policy statement and the act complained of is an implementation of that policy; (2) without a formally announced policy, federal law is violated by an act of the policymaker; or (3) "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'"  <u>Natale v. Camden Cnty.</u>

Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (alteration in original) (quoting City of Canton, 489 U.S. at 390).

Wiley's complaint alleges, "I am asking the Courts to find the City of Phila. liable for the actions of their employees in violation of my Fourth Amendment rights."  Compl. at 5.  In the affidavit accompanying his opposition to the motion for summary judgment, Wiley avers the following:

> 36.  The Police Department is fully [aware] of Detective Daly's [propensity] for misconduct and [their] failure insofar as training, and supervising their employee[s] and the custom officially adopted and promulgated by their officers to arrest citizens, and seize property pursuant to manufactured criminal offenses constitutes the tort of deliberate indifference under the laws of Pennsylvania.
>
> 37.  The Police Departments negligence insofar as allowing the systematic failure of procedures governing the [administrative] supervision of evidence in their custody, lead to the permanent deprivation of the plaintiffs property.

Wiley Affidavit ¶¶ 36-37.

Based on these statements, Wiley brings a Monell claim on the basis that the City allowed an officer "with a history of citizen complaints, and department directive violations to remain employed, unsupervised, and have subordinates under his control."  Pl.'s Mem. Opp'n Mot. Summ. J. at 7.  Furthermore, Wiley argues that the police department should be liable for "procedural deficienc[ies]" with respect to the impoundment and alleged sale of Wiley's vehicle.  Id.  Detective Daly's actions

are a "direct manifestation of department formal or informal policies or the lack of training of [personnel]." Id. The City argues that Wiley has failed to show any specific evidence that the City of Philadelphia has any custom or policy that was the proximate cause of the alleged false arrest and excessive force claims. Defs.' Mot. Summ. J. at 13.

To the extent that Wiley is arguing that municipal liability should be founded on a failure to train or supervise, "liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999) (quoting City of Canton, 489 U.S. at 388). Additionally, "the identified deficiency in a city's training program must be closely related to the ultimate injury"; in other words, "the deficiency in training [must have] actually caused" the constitutional violation. City of Canton, 489 U.S. at 391. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997)).[6]

---

[6] Only in a narrow range of cases, Connick, 131 S. Ct. at 1366, can deliberate indifference be shown absent a pattern of

To determine whether a municipality's alleged failure
to train its employees amounted to deliberate indifference, it
must be shown that "(1) municipal policymakers know that
employees will confront a particular situation; (2) the
situation involves a difficult choice or a history of employees
mishandling; and (3) the wrong choice by an employee will
frequently cause deprivation of constitutional rights." Doe v.
Luzerne Cnty., 660 F.3d 169, 179-80 (3d Cir. 2011) (quoting
Carter, 181 F.3d at 357).

Wiley cites to Detective Daly's "Concise Officer
History" as supporting that the City should be subject to
municipal liability for failure to train.  Pl's Mem. Opp'n Mot.
Summ. J., Ex. F ("Concise Officer History").  This document
lists various complaints made against Detective Daly, and the
disciplinary actions taken against Detective Daly for some of
those complaints.  However, there is no evidence in the record
as to Detective Daly's training.  The disciplinary records of
Detective Daly are insufficient to establish a failure to
properly train or supervise, and Wiley has not identified any

---

prior violations.  There, a plaintiff must demonstrate that a
constitutional violation was sufficiently foreseeable.  See City
of Canton, 489 U.S. at 390 ("[I]n light of the duties assigned
to specific officers or employees the need for more or different
training is so obvious, and the inadequacy so likely to result
in the violation of constitutional rights, that the
policymakers . . . can reasonably be said to have been
deliberately indifferent to that need.").

specific training procedures that are inadequate.  Furthermore,
evidence of a particular officer's inadequate training is not
sufficient to establish municipal liability because the
officer's shortcomings may have resulted from factors other than
a faulty training program.  See McKenna v. City of Phila., No.
07-110, 2007 WL 2343873, at *3 (E.D. Pa. Aug. 15, 2007) (citing
City of Canton, 489 U.S. at 389-91), aff'd, 582 F.3d 447 (3d
Cir. 2009).

      To the extent that Wiley's failure to train theory is
based on his car not being returned to him, it is not clear to
the Court that Wiley's car was not, in fact, returned to him.
Compare Auto Pound Inventory and Evidence Custodian Record, with
Wiley Deposition at 26:21-27:5 and Wiley Affidavit ¶¶ 25-26.
However, there is no evidence that the treatment of Wiley's car
is at all related to any policy or custom instituted by the
City.  This is a single incident, involving a single car, with
no other evidence of a pattern involving the police's treatment
of vehicles.  The issue of Wiley's car also sheds no light on
whether there was a failure to train that amounted to deliberate
indifference, or whether more or different training is "so
obvious" as to establish deliberate indifference.  There is no
evidence at all with regard to training and the treatment of
vehicles by the police.  Therefore, the factual dispute over the

status of Wiley's car does not raise a material issue of fact
that precludes summary judgment.

Wiley has not presented any evidence of any pattern of
incidents necessary to establish the official custom or failure
to train theories of liability.  Nor has Wiley presented
sufficient facts to bring his claim within the narrow category
of single-incident liability.  Most importantly, Wiley has not
shown how the failure of the City to train, supervise, and
discipline police officers has directly and proximately caused
his injuries, such that the Court could reasonably infer that
the policy or custom was the "moving force [behind] the
constitutional violation."  City of Canton, 489 U.S. at 389
(alteration in original) (quoting Monell, 436 U.S. at 694).
Therefore, summary judgment is granted on the § 1983 claim to
the extent it is based on municipal liability.


        D.   Qualified Immunity

The Court need not reach the qualified immunity
question because, as discussed above, there is no evidence in
the record to support Wiley's constitutional claims.  Wiley has
not shown a policy or custom that has proximately caused any
violation of his constitutional rights sufficient to subject the
City to municipal liability.  Lastly, the record does not

support that Wiley was subject to false arrest or that excessive force was used against Wiley during his arrest.

III. <u>Conclusion</u>

For the foregoing reasons, the Court grants summary judgment in the defendants' favor on all of the plaintiff's claims.  An appropriate Order shall issue.